**Hearing Date:** June 12, 2025 at 10:00am (EST)
**Objection Deadline:** June 5, 2025 at 5:00pm (EST)

WINDELS MARX LANE & MITTENDORF, LLP
156 West 56th Street
New York, New York 10019
Telephone (212) 237-1000
Mark A. Slama (mslama@windelsmarx.com)
Eloy A. Peral (eperal@windelsmarx.com)
Daniel F. Corrigan (dcorrigan@windelsmarx.com)

*Attorneys for CPC Funding SPE 1 LLC*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------------------x

In re:                                                      Chapter 11

    VALDESIA GARDENS HOUSING                    Case No.: 24-23086 (KYP)
    DEVELOPMENT FUND CORPORATION,

                        Debtor.
-------------------------------------------------------------------------x

**NOTICE OF MOTION OF CPC FUNDING SPE**
**1 LLC FOR AN ORDER MODIFYING OR TERMINATING**
**THE AUTOMATIC STAY PURSUANT TO 11 U.S.C. § 362(d)(1)-(3)**

    **PLEASE TAKE NOTICE THAT** on May 7, 2025, the undersigned filed the *Motion of CPC Funding SPE 1 LLC For An Order Modifying Or Terminating The Automatic Stay Pursuant To 11 U.S.C. § 362(d)(1)-(3)* (the "***Motion***") on behalf of CPC Funding SPE 1 LLC ("***CPC***").

    **PLEASE TAKE FURTHER NOTICE THAT** the Motion will be heard before the Honorable Kyu Y. (Mike) Paek, United States Bankruptcy Judge, at the United States Bankruptcy Court, Southern District of New York, One Bowling Green, New York, NY 10004 on **June 12, 2025 at 10:00 A.M. EST** (the "***Hearing***") in Courtroom 610, or as soon thereafter as counsel may be heard, to consider the Motion.

    **PLEASE TAKE FURTHER NOTICE THAT** that objections, if any, to any of the relief requested in the Motion shall be made in writing, filed with the Court on the Court's Electronic

Case Filing System at www.ecf.nysb.uscourts.gov (login and password required) with a copy delivered directly to and served upon the undersigned attorneys for CPC, so as to be received no later than **June 5, 2025 at 5:00 P.M. EST**.

**PLEASE TAKE FURTHER NOTICE THAT** the Hearing will be held via Zoom® conference. Participants are required to register their appearance by 4:00 P.M. the day before any scheduled Zoom® hearing at https://ecf.nysb.uscourts.gov/cgibin/nysbAppearances.pl.

Dated: New York, New York      Respectfully submitted,
       May 7, 2025

WINDELS MARX LANE & MITTENDORF, LLP
*Attorneys for CPC Funding SPE 1 LLC*

By:    */s/ Mark A. Slama*
      Mark A. Slama (mslama@windelsmarx.com)
      Eloy A. Peral (eperal@windelsmarx.com)
      Daniel F. Corrigan (dcorrigan@windelsmarx.com)
      156 West 56th Street
      New York, New York 10019
      Tel. (212) 237-1000

**Hearing Date:** June 12, 2025 at 10:00am (EST)
**Objection Deadline:** June 5, 2025 at 5:00pm (EST)

WINDELS MARX LANE & MITTENDORF, LLP
156 West 56th Street
New York, New York 10019
Telephone (212) 237-1000
Mark A. Slama (mslama@windelsmarx.com)
Eloy A. Peral (eperal@windelsmarx.com)
Daniel F. Corrigan (dcorrigan@windelsmarx.com)

*Attorneys for CPC Funding SPE 1 LLC*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------------------x

| | |
|---|---|
| In re: | Chapter 11 |
| VALDESIA GARDENS HOUSING DEVELOPMENT FUND CORPORATION, | Case No.: 24-23086 (KYP) |
| Debtor. | |

-------------------------------------------------------------------------x

### MOTION OF CPC FUNDING SPE 1 LLC FOR AN ORDER MODIFYING OR TERMINATING THE AUTOMATIC STAY PURSUANT TO 11 U.S.C. § 362(d)(1)-(3)

CPC Funding SPE 1 LLC ("***CPC***"), by its undersigned counsel, Windels Marx Lane & Mittendorf, LLP, files this motion (the "***Motion***") pursuant to § 362(d)(1)-(3) of title 11 of the United States Code, 11 U.S.C. §§ 101 et. seq. (the "***Bankruptcy Code***") for relief from the automatic stay to permit CPC to exercise its rights under the Loan Documents (defined below) and other applicable law with respect to the above-captioned debtor (the "***Debtor***") and its real property, including to complete the pre-petition state court foreclosure action commenced by CPC, and granting related relief.

In support of the Motion, CPC relies on the Declaration of Eloy A. Peral (the "***Peral Declaration***") and further states as follows:

{12433381:4}

## I.    PRELIMINARY STATEMENT

1.      The centerpiece of the Debtor's Chapter 11 plan is priming DIP financing. The Debtor claims it needs $6 million in DIP financing, which would need to prime CPC's mortgage, to fund completion of its mixed-use, affordable housing project. Simply stated, there is no equity in the property or the project to support junior debt even if the Court were to give credence to the Debtor's wildly inflated appraisal.  Nearly six months have passed since the Debtor filed its Chapter 11 petition and the DIP financing has not materialized and likely never will. Not a single adequate protection payment has been made and Debtor's sole asset, an unfinished apartment building, is simply diminishing in value while expenses (including real estate taxes and insurance premiums) continue to accrue without any income being generated by the Debtor or its operations.

2.      The Debtor claims the current fair market value of the property is $15.6 million and that the property will be worth $25.1 million once construction is complete. CPC's claim was $19.7 million as of the bankruptcy filing and to the extent it is ultimately over-secured, its claim will include significant post-petition interest, attorneys' fees and other costs. Even accepting the Debtor's valuations as valid, it is unsurprising no one is willing to lend to the Debtor even on a priming basis. More troubling is that the Debtor's valuations are incredibly overstated. An appraisal obtained by CPC in August 2022 showed that a fully constructed and occupied building would be worth less than $12 million. Moreover, the Debtor's proposed reorganization presumes – despite its prior failure – that it will succeed in completing the project within budget and a reasonable time period, and without construction problems. Yet the Debtor has not given any reason to believe it can complete the project this time around.

3.      For this and other reasons, the proposed Chapter 11 plan is not confirmable. Specifically, the plan (I) is not feasible (§1129(a)(11)), (II) does not treat CPC fairly and equitably,

which means the Debtor cannot cramdown CPC (§1129(b)(2)(A)), (III) violates the absolute priority rule by allowing the Debtor's parent to retain its equity interest for free (§1129(b)(2)(B)), and (IV) will never garner an accepting impaired class which dooms the plan even if a cramdown is successful (§1129(a)(10)). Not surprisingly, as the building is not generating any rents, the Debtor has not made a single payment to CPC during the bankruptcy. Accordingly, § 362(d)(3) of the Bankruptcy Code requires that the Court modify the automatic stay to allow CPC to complete its foreclosure action. Alternatively, for the same reasons summarized above, the automatic stay should be modified pursuant to § 362(d)(1)-(2).

## II.      VENUE AND JURISDICTION

4.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding under 28 U.S.C. § 157 (b) (2) (A), (E), and (G). Venue of this proceeding and this Motion is proper in this district pursuant to 28 U.S.C. § 1409 (a). The statutory predicates for the relief sought herein are §§ 105(a) and 362(d)(1)-(3) of the Bankruptcy Code, Bankruptcy Rule 4001, and Local Bankruptcy Rule 4001-1.

## III.      BACKGROUND

### a.  *General Background*

5.      On December 13, 2024, the Debtor filed a chapter 11 petition with the U.S. Bankruptcy Court for the Southern District of New York (the "***Court***"). The Debtor is a "single asset real estate" debtor within the meaning of Bankruptcy Code § 101(51B). No trustee, committee of creditors, or examiner has been appointed in the Debtor's chapter 11 case.

6.      The Debtor is a not-for-profit corporation formed under section 573 of the New York Private Housing Finance Law to acquire title to and redevelop the real property consisting of a 50,000 square foot, seven story building located at 569-575 Prospect Avenue, Bronx, New

York 10455 (the "***Real Property***").[1] With financing provided by CPC, the Debtor intended to develop the Real Property into a multi-family, mixed-use building with approximately 45 rental residential units and several first floor commercial rental spaces (the "***Project***").[2] The Project was never completed as further discussed below.

7.     The Real Property is an affordable housing development and is subject to New York's rent regulation and rent stabilization statutes.  Moreover it is encumbered by a Regulatory Agreement between Debtor and the City of New York.

8.     Valdesia Gardens LLC (the "***Parent***") holds 100% of the membership interests in the Debtor.[3] At the time the Loans (defined below) were made, KB NY 001 LLC, the managing member of the Parent, held 40 % of the membership interests in the Parent and Valdesia Holding Corp. held 60% of the membership interests. The members of the Parent are controlled by Leopoldo Baez, Emanuel Kambanis, and the Estate of Luis Baez.

**b.  *The Loans***

9.     On or about June 27, 2017, CPC made several loans to Debtor and Parent, as co-borrowers (the "***Borrowers***"), in the total original principal amount of $13,670,000.00 (the "***Loans***") as evidenced by a: (i) First Multifamily Construction Note (the "***First Construction Note***"); (ii) Second Multifamily Construction Note (the "***Second Construction Note***"); and (iii) Multifamily Project Note (the "***Project Note***", collectively with the First Construction Note and

---

[1] Declaration of David Goldwasser Pursuant to Local Bankruptcy Rule 1007-2, ECF No. 2 ("***First Day Declaration***"), ¶ 2.

[2] *Id*. ¶ 4.

[3] List of Equity Security Holders, ECF No. 1 at p. 30.

Second Construction Note referred to as the "***Notes***" and with all other documents evidencing and comprising the Loan, as  the "***Loan Documents***").[4]

10.    The Borrowers' obligations under the Loans are secured by a first priority mortgage lien on the Real Property pursuant to a: (i) Construction and Project Loan Agreement; (ii) First Multifamily Construction Loan Mortgage, Assignment of Rents, Security agreement and Fixture Filing; (ii) Second Multifamily Construction Loan Mortgage, Assignment of Rents, Security agreement and Fixture Filing; and (iii) Multifamily Project Loan Mortgage, Assignment of Rents, Security Agreement and Fixture Filing (collectively, the "***Mortgages***").[5]

11.    The Loans are further secured by an Assignment of Leases and Rents (the "***ALR***") pursuant to which CPC holds a perfected first priority lien on all of the Debtors' non-real property assets, including, among other things, the rents ("***Rents***"), fixtures and personal property associated with the Real Property.[6] Under the ALR, CPC granted Borrowers a revocable license to collect Rents for the Real Property which could be terminated upon, *inter alia*, the Borrowers' default under the Loan Documents.

12.    Leopoldo Baez, Emanuel Kambanis, and Luis Baez[7] ("***Guarantors***," together with the Borrowers, the "***Obligors***") each executed an Exception to Non-Recourse Guaranty in favor of CPC guarantying the Borrowers' obligations under the Loan.[8] In addition, they each executed a

---

[4] Copies of the Notes are attached to the Verified Amended Complaint in Foreclosure filed by CPC (the "***Complaint***") as Exhibits 1, 3, and 5. A copy of the Complaint is attached to the Peral Declaration as **Exhibit A**.

[5] Copies of the Mortgages are attached to the Complaint as Exhibits 2, 4, and 6.

[6] A copy of the ALR is attached to the Complaint as Exhibit 7.

[7] Luis Baez is deceased. Alexis M. Baez was appointed as Administrator for the Estate of Luis Baez on February 19, 2018. Compl. ¶ 8.

[8] A copy of the Exceptions to Non-Recourse Guaranty are attached to the Complaint as Exhibit 9.

Completion Guaranty under which they promised to, *inter alia*: (i) complete all construction, rehabilitation and/or repairs to the Improvements (as defined in the Loan Documents) and the work on or before the Completion Date (as defined in the Loan Agreements).[9]

13.     The non-default interest rate was LIBOR (now SOFR) plus 4.80% for the Construction Note and Project Note and 2.90% for the Second Construction Note.[10] The initial default interest rates for all Loans was 4% above the non-default rates.[11]

14.     The Loans were initially to mature on July 1, 2019 (as amended, the "***Maturity Date***") and April 1, 2019 was the date by which the Obligors were required to complete the Project (as amended, the "***Completion Date***").[12]

15.     From July 26, 2019 through August 24, 2021, CPC and the Obligors entered into five separate Maturity Extension Agreements which, *inter alia*, extended the Completion Date and Maturity Date and increased the default interest rates to 18% for the First Construction Loan and Project Loan and to 6.90% for the Second Construction Loan.[13] The fifth and final Maturity Extension Agreement extended the Maturity Date and Completion Date to December 1, 2021 (the "***Final Maturity Date***" or "***Final Completion Date***").[14]

---

[9] A copy of the Completion Guaranty is attached to the Complaint as Exhibit 10.

[10] *See* Notes, Schedule A.

[11] *See Id*.

[12] *See* Notes, ¶ 1 (definitions).

[13] *See* Compl. ¶ 44. A copy of the fifth and final Maturity Extension Agreements is attached to the Complaint as Exhibit 11.

[14] *See* Compl. ¶ 45.

### c. *Defaults and Foreclosure Action*

16.    The Obligors initially defaulted under the Loan Documents by, *inter alia*, failing to pay CPC all amounts due under the Loans by the Final Maturity Date.

17.    CPC issued and delivered a Notice of Default, Acceleration, and Demand for Payment (the "***Default Notice***") to the Debtor, the Parent and the Guarantors.  In the Default Notice, CPC, *inter alia*, demanded repayment of all principal, interest and other charges under the Loan which were due and revoked the Debtor's licenses to collect Rents, issues, and profits arising from or related to the Real Property.

18.    On May 19, 2022, CPC commenced an action against the Obligors, among other defendants, by filing the Complaint with the Supreme Court of the State of New York, Bronx County (the "***State Court***"), to, *inter alia*, foreclose the mortgage encumbering the Real Property (the "***Foreclosure Action***").[15]

19.    The State Court granted CPC's motion for summary judgment on all counts in favor of CPC as set forth in a Decision and Order entered on November 15, 2023.[16]

20.    A Judgment of Foreclosure and Sale was entered on September 19, 2024 awarding CPC a total of $18,068,566.72 as of March 31, 2024, together with interest at the default interest rate, with advances if any, from March 31, 2024 to the date of entry of final judgment on September 16, 2024 and interest thereafter on the total sum due to CPC, together with costs and legal fees (the "***Judgment***").[17]

---

[15] A copy of the original Verified Complaint in Foreclosure (without exhibits) filed on May 19, 2022 is attached as **Exhibit B** to the Peral Declaration.

[16] A copy of this Decision and Order is attached as **Exhibit C** to the Peral Declaration.

[17] A copy of the Judgment is attached as **Exhibit D** to the Peral Declaration

21.    A foreclosure sale was then scheduled for Monday, December 16, 2024.[18] The Debtor filed its chapter 11 petition on Friday, December 13.

### d. *Borrowers' Failure to Complete the Project and Safeguard the Real Property*

22.    Although the Project was to be completed by December 2021 (after multiple extensions extended by CPC at Obligors' request), construction came to a grinding halt prior to the Final Completion Date, because the Borrowers did not have the funds to complete the Project.[19] The Borrowers failed to complete construction and did not pay subcontractors and suppliers resulting in mechanics' liens being filed against the Real Property.[20]

23.    In late 2021, the Borrowers left the construction site at the Real Property unprotected and vulnerable to theft, destruction, and exposure of unfinished structure to the elements.[21] Around that time, CPC learned that a nearby building under construction was recently stripped of its plumbing and electrical wiring by vandals who likely sold it for the value of the scrap metal.[22]

24.    After the Debtor abandoned the Project, CPC sought the appointment of a Rent Receiver in the Foreclosure Action to safeguard the Real Property and to prevent further

---

[18] A copy of the Notice of Sale setting the sale for December 16, 2024 is attached as **Exhibit E** to the Peral Declaration.

[19] *See Affirmation Of Mark A. Slama In Support Of Ex Parte Application For The Appointment Of A Receiver* dated August 17, 2022 (the "***Slama Affirm. ISO Receiver***"), ¶ 14. A copy of the Slama Affirm. ISO Receiver is attached as **Exhibit F** to the Peral Declaration.

[20] *Id.* ¶ 15.

[21] *Id.*

[22] *Id.*

degradation of the partially finished Project. On or about October 13, 2022, the State Court appointed Robert Abrams, Esq. ("**Receiver**") as the receiver for the Real Property.[23]

25.    The Project is 66% complete according to the appraisal obtained by the Debtor and shared with CPC[24] and 85% complete according to the First Day Declaration.[25] The Debtor believes $6 million is needed to complete the Project.[26]

### e.  *The Debtor's Unconfirmable Chapter 11 Plan*

26.    On March 10, 2025 – 87 days after the Petition Date – the Debtor filed a Plan of Reorganization (the "**Plan**") and Disclosure Statement.[27] Under the Plan, the Debtor would endeavor to complete the construction of the Real Property within nine months of the Effective Date utilizing DIP Financing (the "**Construction Completion Date**").[28] The Debtor would then have 90 days from the Construction Completion Date to refinance the Real Property (the "**Refinance Deadline**") and if the Debtor cannot meet the Refinance Deadline, it must sell the Real Property at a public auction within 60 days following the Refinance Deadline.[29] If the Debtor fails to meet the foregoing deadlines, make required distributions to creditors or comply with any other material terms of the Plan, and the Debtor has not cured a default within ten days thereafter, CPC

---

[23] *See Order Appointing Receiver at Mortgaged Premises and Appointment of Receiver's Counsel*, a copy of which is attached as **Exhibit G** to the Peral Declaration.

[24] *See* page 3 of Appraisal Report prepared by Republic Valuations dated January 27, 2025 ("**Debtor's Appraisal**"). A copy of Debtor's Appraisal is attached as **Exhibit H** to the Peral Declaration.

[25] First Day Declaration, ¶ 5

[26] First Day Declaration, ¶ 5; Disclosure Statement, Art. I.

[27] ECF Nos. 36-37.

[28] Plan Sec. 5.2.

[29] *Id*. Unless otherwise stated, capitalized terms herein that are undefined shall have the meanings ascribe to them in the Plan.

may "set a sale" of the Real Property pursuant to §§ 363 and 1123(b)(4) of the Bankruptcy Code and creditors may commence an action against the Debtor to compel payment on their claims in any court of competent jurisdiction.[30]

27.    The Plan contemplates that the DIP Financing will be granted super-priority administrative expenses status and prime CPC's mortgage.[31] The Plan and Disclosure Statement are otherwise silent as to the terms and conditions of the DIP Financing and the identity of the DIP lender.  The Debtor has not filed a motion to approve DIP Financing.

28.    Payments to creditors will be funded by the refinance or sale of the Real Property and no other payments or distributions will be made to CPC or other creditors before or after the Construction Completion Date. The Plan provides for four classes of Claims and Interests: (i) Real Estate Tax Claims (Class 1); (ii) the Secured CPC Claim (Class 2); (iii) General Unsecured Claims (Class 3); and (iv) membership Interests in the Debtor (i.e., the Parent) (Class 4). Classes 1 and 4 are treated as unimpaired and Class 2 and 3 are treated as impaired and have the right to vote.

29.    The Plan allows the Parent to retain its Interests without contributing any value to the Plan.

### f.  Claims Against the Debtor

30.    CPC timely filed a proof of claim (no. 5) asserting a secured claim in the amount of $19,720,999.84 as of the Petition Date. As detailed in CPC's proof of claim, CPC has made

---

[30] Plan, Art. X.

[31] *See id.* Sec. 2.5 ("Amounts under the DIP Financing shall be paid in full prior to any payments being made to holders of: (i) Class 2 Allowed Secured CPC Claims, and (ii) Class 3 Allowed Unsecured Claims."); Sec. 4.3 (providing that the Class 2 CPC Secured Claim will receive a distribution after the outstanding amount of the DIP Financing and Class 1 Real Estate Tax Claims are paid in full).

more than $1.5 million in protective advances to satisfy taxes and insurance, among other liabilities of the Debtor.

31.     The following other proofs of claim have been filed:[32]

| Claimant and Claim No. | Claim Amount | Classification | Basis |
|---|---|---|---|
| Cesar Garcia Gomez (No. 1) | Unliquidated | General unsecured | Pre-petition complaint for personal injuries |
| Internal Revenue Service (No. 2) | $875.00 | $500 as a priority tax claim and $375 as a general unsecured claim | Taxes |
| Mohammed Aziz Individually and as President of U.S. Tech Construction Corp. (No. 3) | $170,815.52 | General unsecured | Pre-petition complaint for conversion and breach of fiduciary duty (Debtor not a defendant) |
| Robert Abrams, as Receiver (No. 4) | $18,870.25 | General unsecured | Legal fees |
| Suds And Stuff, Inc. (No. 6) | $836,171.00 | General unsecured | Pre-petition complaint for Breach of Contract, among other claims (Debtor not a defendant) |
| OATH ECB NYC (No. 7) | $44,845.86 | $39,915.86 as a secured claim and $4,930.00 as a general unsecured claim | Penalties for housing violations |
| | $1,071,577.63 | | |

32.     No undisputed claims are scheduled by the Debtor.

**g.  *The Real Property's Fair Market Value***

33.     The Debtor has obtained an appraisal providing a $15.6 million "as is" market value as of December 24, 2024 for the Real Property and a $24.1 million value upon completion of the Project in April 2026.[33] The Debtor's valuation is wildly overstated and deficient. In August 2022, CPC obtained an appraisal ascribing a valuation in the $10,810,00 to $11,360,000 range *for the*

---

[32] The governmental bar date is June 11, 2025. The general bar date was March 3, 2025.

[33] A copy of the Debtor's Appraisal is attached to the Peral Declaration as **Exhibit H**.

*completed Project.*[34] The value of the Real Property has likely diminished since CPC obtained its appraisal in August 2022.

## IV.    ARGUMENT

### a.  <u>**Stay Relief is Warranted Under Section 362(d)(3)**</u>

34.    "Section 362(d)(3) compels debtors to act swiftly by obligating them to fulfill one of two mandates by 'not later than the date that is 90 days after the' petition date." *In re RYYZ, LLC*, 490 B.R. 29, 33–34 (Bankr. E.D.N.Y. 2013) (quoting 11 U.S.C. § 362(d)(3)).  The debtor must either (A) "file[ ] a plan of reorganization that has a reasonable possibility of being confirmed within a reasonable time" (11 U.S.C. § 362(d)(3)(A)), or, failing this, (B) make monthly payments "in an amount equal to interest at the then applicable non-default contract rate of interest on the value of the creditor's interest in the real estate (11 U.S.C. § 362(d)(3)(B)(ii))." *Id.*

35.    The Debtor has failed to meet either of the two mandates in § 362(d)(3). No payments have been made to CPC during the Chapter 11 case. The Debtor can avoid modification of the automatic stay under § 362(d)(3) only if the Court finds that the Plan has a "reasonable possibility of being confirmed within a reasonable time" under § 362(d)(3)(A).

36.    To prove a reasonable possibility of confirmation within a reasonable time, the Debtor must show that "the proposed ... plan has a realistic chance of being confirmed [and] is not patently unconfirmable" although "adjudicating a relief from stay motion under § 362(d)(3)(A) is not to be a mini confirmation hearing." *In re Carlsbad Dev. I, LLC*, No. 08-27768, 2009 WL

---

[34] A copy of the appraisal dated September 22, 2022 prepared by Anthony T. Panzarino is attached to the Peral Declaration as <u>**Exhibit I**</u>. This appraisal provides an "as is" market value of $12,360,000, which is higher than the market value of the Real Property if the Projected were completed. For purposes of arriving at the as is value, the appraiser used market rents and did not account for the regulatory agreement. *See* p. 73.

588662, at *3 (Bankr. D. Utah Mar. 6, 2009) (quoting *In re Windwood Heights, Inc.*, 385 B.R. 832, 838 (Bankr. N.D.W. Va. 2008)).

37.     The Plan is patently unconfirmable for the long list of reasons detailed below. Accordingly, § 362(d)(3)(A) requires stay relief. [35]

### i. The Plan is not feasible (11 U.S.C. § 1129(a)(11)).

38.     Under § 1129(a)(11), the Court may confirm an otherwise confirmable plan only if "[c]onfirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan." 11 U.S.C. § 1129(a)(11). "Although the [Bankruptcy] Code does not use the terms' 'feasible' or 'feasibility,' " *In re Red Mountain Mach. Co.*, 451 B.R. 897, 906 n. 22 (Bankr.D.Ariz.2011), the requirement imposed by § 1129(a)(11) is commonly known as the " 'feasibility' test for confirmation." 83 B.R. at 50.

39.     The purpose of § 1129(a)(11) "is to prevent confirmation of visionary schemes that promise creditors and equity security holders more under a proposed plan than the debtor could possibly attain after confirmation." *In re Sound Radio, Inc.*, 103 B.R. 521, 522 (D.N.J.1989), *aff'd without opinion*, 908 F.2d 964 (3d Cir.1990) (quoting *In re Landmark at Plaza Park, Ltd.*, 7 B.R. 653, 659 (Bankr.D.N.J.1980)). While "[s]uccess need not be guaranteed," *Johns–Manville Corp.*, 843 F.2d 636, 649 (2d. Cir. 1988), to establish feasibility the plan must be "workable and ha[ve] a reasonable likelihood of success." *In re Drexel Burnham Lambert Group*, 138 B.R. 723, 762 (Bankr.S.D.N.Y.1992). "Feasibility determinations must be firmly rooted in predictions based on objective fact." *Danny Thomas Properties II L.P. v. Beal Bank, S.S.B. (In re Danny Thomas*

---

[35] CPC does not raise in this Motion every basis to deny confirmation of the Plans and reserves all rights to raise additional bases to deny confirmation whether in connection with CPC's motion or during a plan confirmation process.

*Properties II L.P.)*, 241 F.3d 959, 964 (8th Cir.2001) (internal quotation marks and citation omitted).

40.     The Plan is not feasible because the Debtor has not secured financing, whether a priming DIP or otherwise, to fund completion of the Project. Indeed, it is unlikely financing is obtainable due to the lack of equity in the Real Property, the negligible equity (if any) that would be realized upon Project completion (even accepting the Debtor's inflated valuation at face value), and the Debtor's historical failure to complete the Project and safeguard the Real Property. To be clear, CPC believes that the value of the Real Property after Project completion will not be nearly enough to satisfy CPC's claim *even assuming CPC is not primed*. The Debtor's inability to propose any priming DIP financing despite the passage of more than five months since the Petition Date bolsters CPC's views about the Real Property's value.

41.     The decision in *In re Swiftco, Inc.*, No. 85-07083-H1-5, 1988 WL 143714 (Bankr. S.D. Tex. Oct. 5, 1988) illustrates how the uncertainty surrounding the Plan and the sale of the Real Property dooms the feasibility test. In *Swiftco* the proposed plan of reorganization provided that for a period of approximately two years after confirmation the debtor would sell or refinance its primary asset, an apartment project. *Id*. at 1. The proceeds of the sale or refinance would be distributed to secured creditors holding a lien on the property. *Id*. The allowed secured claims were more than $5.7 million in the aggregate. *Id*. During the time that the apartments were listed for sale, the debtor would continue to own and manage the apartments. *Id*. The secured creditors were to receive quarterly installment payments under the plan pending the sale or refinance. *Id*.

42.     The court concluded that the plan was not feasible because the debtor failed to present evidence "that the money required to be paid under the proposed plan will be available to a reasonable certainty." *Id*. at *7. The court pointed to various "troubling factors" including the

unsubstantiated opinion of the debtor's sole shareholder that the property will be worth at least $5 million at the time of maturity. The court was not satisfied that this "prediction is reasonably certain to the extent necessary to make a finding." *Id.* at *8. The court in *Swiftco* continued:

> This court does not require that a buyer or lender be currently available and willing to undertake the future transaction. However, the debtor failed to show that there is a market of possible buyers or financiers anywhere who would even consider buying or financing the apartment project under any conditions. That a sale or refinancing will occur as promised is therefore speculative. If no sale or refinancing occurs, the property is simply to be returned to the lienholder, a result that this court cannot prospectively ratify. Such an act would essentially allow the foreclosure to proceed in 1991 when it was stayed by the filing of the petition in 1985. *To keep the secured creditors waiting for identical relief, to which they were entitled under non-bankruptcy law in 1985, until 1991 without their consent and over their objections is not permissible under bankruptcy law.*

*Id.* (emphasis added). *See also In re M & C P'ship*, LLC, No. 19-11529, 2021 WL 12102059 (Bankr. E.D. La. Mar. 15, 2021) (relying on the analysis in *Swiftco* to support its finding of a lack of feasibility).

43.    As in *Swiftco*, under the Debtor's Plan, CPC and other creditors would achieve the same result that could have been achieved if the foreclosure sale occurred but only after being subjected to the delays and expenses of a bankruptcy. Moreover, the Plan here is more detrimental to creditors than the plan was to secured creditors in *Swiftco*. In that case, the plan provided for quarterly installment payments to the secured creditors and that upon the debtor's default the secured creditors could proceed with the foreclosure without further court order. The Plan here has none of those features.

44.    For the above reasons, the Plan has no prospect of confirmation because it fails the feasibility test.

ii.     **The Plan is not fair and equitable to CPC (11 U.S.C. §
        1129(b)(2)(A)).**

45.     A plan of reorganization cannot be confirmed over the objection of secured

lenders unless it is "fair and equitable." *See* 11 U.S.C. § 1129(b)(1). Section 1129(b)(2)(A)

provides three circumstances under which a plan is "fair and equitable" to secured creditors:

> (A) With respect to a class of secured claims, the plan provides—
>
> (i)   (I) that the holders of such claims retain the liens securing such claims,
>       whether the property subject to such liens is retained by the debtor or
>       transferred to another entity, to the extent of the allowed amount of
>       such claims; and (II) that each holder of a claim of such class receive
>       on account of such claim deferred cash payments totaling at least the
>       allowed amount of such claim, of a value, as of the effective date of the
>       plan, of at least the value of such holder's interest in the estate's interest
>       in such property.
>
> (ii)  for the sale, subject to section 363(k) of this title, of any property that
>       is subject to the liens securing such claims, free and clear of such liens,
>       with such liens to attach to the proceeds of such sale, and the treatment
>       of such liens on proceeds under clause (i) or (iii) of this subparagraph;
>       or
>
> (iii) for the realization by the holders of the indubitable equivalent of such
>       claims.

11 U.S.C. § 1129(b)(2)(A)(i)-(iii).

46.     The Plan does not satisfy the fair and equitable standard in § 1129(b)(2)(A) for at

least three reasons.

47.     *First*, the Plan does not satisfy § 1129(b)(2)(A)(i), because it deprives CPC of

deferred cash payments (let alone payments totaling the present value of their claim) pending sale

of the Real Property.

48.     *Second*, the Plan does not provide for the "indubitable equivalent" of CPC's secured

claim. Indubitable means "not open to question or doubt," while equivalent means one that is

"equal in force or amount" or "equal in value." *In re Philadelphia Newspapers*, LLC, 599 F.3d

298, 310 (3d Cir.2010) (quoting Webster's Third New Int'l Dictionary 769, 1154 (1971). "Thus 'indubitable equivalent' under subsection (iii) is the unquestionable value of a lender's secured interest in the collateral."

49.    The Plan deprives CPC of the indubitable equivalent of its claims for the same (and additional) reasons that the Plans are not feasible.[36] The Plan would force CPC to wait more than nine months to receive *any* payment and exercise its rights under the Loan Documents while the Debtor endeavors to complete the Project. Even assuming it can obtain adequate DIP financing for the Project, which it has not done, there is no reason to think Debtor's prospect of completing the Project has improved post-petition. For these reasons, the Plans do not as a matter of law provide CPC with the indubitable equivalent of its claims. *See In re Philadelphia Rittenhouse Dev., L.P.*, No. BR 10-31201 SR, 2011 WL 13043475, at *5, 19 (Bankr. E.D. Pa. May 25, 2011) (no indubitable equivalent where plan provided that debtor would retain control of condominium project and sell the condominium units to third party purchasers over a 3 to 4 year period while secured lender was to receive interest-only monthly payments and there was a potential to receive monthly payments of principal); *In re Swiftco, Inc.*, 1988 WL 143714 at *13 (no indubitable equivalent because, *inter alia*, plan provides for a speculative sale or refinancing from some unknown source sometime in the future).

50.    *Lastly*, the Plan's aspirational post-effective date sale of the Real Property cannot

---

[36] *See In re M & C P'ship,* LLC, No. 19-11529, 2021 WL 12102059, at *11 (Bankr. E.D. La. Mar. 15, 2021) ("Feasibility and fair-and-equitable treatment are separate statutory requirements, '[b]ut, quite simply, if a debtor's proposal to pay a lender over an extended repayment period is not feasible, then it cannot be fair and equitable—at least not in the broad, nontechnical sense of that term—to allow the debtor to attempt to repay the lender over the extended period.'" (quoting *In re Trenton Ridge Investors, LLC*, 461 B.R. 440, 503–04 (Bankr. S.D. Ohio 2011).

satisfy § 1129(b)(2)(A)(ii) for at least two independent reasons. First, as explained above, the Plans

do not satisfy either § 1129(b)(2)(A)(i) or (iii) as required by the final clause § 1129(b)(2)(A)(ii)

providing that the proceeds of the sale be "treat[ed] . . . under clause (i) or (iii) of this

subparagraph." Second, a plan that provides for a potential sale under § 1129(b)(2)(A)(ii) "at some

unspecified future time, to some unspecified purchaser, at an unspecified price and on unspecified

terms" deprives the dissenting creditor of the fairness required under the cramdown principles of

§ 1129(b)(1). *In re Swiftco, Inc.*, 1988 WL 143714, at *14 (quoting *In re Western Real Estate

Fund, Inc.*, 75 B.R. at 589 (Bankr.W.D.Okla.1987)).

      51.    For the multitude of reasons set forth above, the Plan is not fair and equitable under

§ 1129(b)(1), (b)(2)(A) and thus cannot be confirmed through a cramdown.

### iii.    The Plan violates the absolute priority rule (11 U.S.C § 1129(b)(2)(B))

      52.    Section 1129(b)(2)(B) provides that with respect to unsecured claims, the fair and

equitable standard will not be met unless "(i) the plan provides that each holder of a claim of such

class receive or retain on account of such claim property of a value, as of the effective date of the

plan, equal to the allowed amount of such claim; or (ii) the holder of any claim or interest that is

junior to the claims of such class will not receive or retain under the plan on account of such junior

claim or interest any property . . . ." 11 U.S.C § 1129(b)(2)(B). Known as the "absolute priority

rule," § 1129(b)(2)(B) provides "that no class of creditors or interest holders may recover in

Chapter 11 unless the claims of all creditor and interest holder classes senior to them have been

satisfied in full, barring agreement by a senior class to lesser treatment of its claims." *In re

LightSquared, Inc.*, 534 B.R. 522, 533 (S.D.N.Y. 2015), aff'd sub nom. *Ahuja v. LightSquared Inc.*,

644 F. App'x 24 (2d Cir. 2016).

53.     The Plan violates the absolute priority rule, because under the Plan general unsecured claims will not receive a 100 percent distribution upon the Effective Date while the Parent will retain its equity and managerial interests in the Debtor.  *Philadelphia Rittenhouse* is illustrative on this point. That case involved a "straightforward" plan providing that the debtor would retain control of a condominium project and sell the unsold condominium units to third party purchasers over a 3 to 4 year period. 2011 WL 13043475, at *5.  The secured lender argued that the debtor's retention of the "bundle of rights" and "economic benefits" associated with managerial control of the debtor constituted property, and that in order for the debtor's interest holder to retain such property, it must expose the interest in question to a market test consistent with the holding of the Supreme Court in *Bank of Am. Nat'l Trust and Sav. Assoc. v. 203 N. LaSalle P'shp*, 526 U.S. 434, 458, 119 S.Ct. 1411, 1424 (1999). *Id*. at *14. The debtor countered that the equity interest holder was not receiving a cash distribution prior to paying all creditors in full and thus was not receiving an economic benefit affected by the absolute priority rule. *Id*. at *15. The court sided with the secured lender and concluded that the plan violated the absolute priority rule. *Id*. at *16. To support its conclusion, the court relied on the holdings in *LaSalle* and *In re PWS Holding Corporation*, 228 F.3d 234, 238–239 (3d Cir.2000) and in particular the view that the retention of managerial control is a form of property that is retained by the equity interest holder "on account," *see* § 1129(b)(2)(B)(ii), of the associated equity interest. *Id*. at *15-16.

54.     Here, the Plan allows the Parent to immediately retain its membership interests and managerial control in the Debtor for free, while CPC and other creditors must wait for a sale that is very unlikely to result in full payment of CPC's secured claim. This causes the Plan to fail the absolute priority test. *See In re RYYZ, LLC*, 490 B.R. 29, 44 (Bankr. E.D.N.Y. 2013) (finding that the single asset real estate debtor's plan violated the absolute priority rule because equity holders

would retain their interests without providing "new value" while not fully satisfying the deficiency claim of the secured lender).

55.     Accordingly, the Plan violates the absolute priority rule and cannot be confirmed for this additional reason.

### iv.     No impaired class will vote to accept the Plan (11 U.S.C. § 1129(a)(10)).

56.     Under Bankruptcy Code § 1129(a)(10), at least one impaired class, excluding the votes of insiders, must vote to accept the Plan for the Plan to be confirmed. *See In re LightSquared, Inc.*, 534 B.R. at 533 (citing 11 U.S.C. § 1129(a)(10)).

57.     CPC controls the two impaired classes under the Plan – Class 2 consisting of the Secured CPC Claim and Class 3 consisting of General Unsecured Claims. General Unsecured Claims, other than the General Unsecured Claim of CPC, total approximately $1,025,000 and the General Unsecured Claim of CPC is approximately $3,770,999 based on the inflated $15.6 million as-is value in the Debtor's appraisal.

58.     Accordingly, even if the Debtor could somehow succeed in cramming-down CPC, the Plan will never be confirmed in any event because no impaired class will vote to accept the Plan.

### b.     <u>Causes Exists to Grant Stay Relief Under Section 362(d)(1)</u>

59.     Bankruptcy Code § 362(d)(1) provides that the Court "shall grant relief from the stay . . . such as by terminating, annulling, modifying, or conditioning such stay-- (1) for cause, including the lack of adequate protection of an interest in property of such party in interest."  The term "cause" is not defined in the Bankruptcy Code, and whether cause exists should be determined on a case by case basis.  *In re Balco Equities Ltd., Inc.*, 312 B.R. 734, 748 (Bankr. S.D.N.Y. 2004) (citing *In re Sonnax Indus.*, 907 F.2d 1280, 1286 (2d Cir.1990)).

60.     A party seeking relief from the automatic stay pursuant to § 362(d)(1) "must make an initial showing of cause and upon such a showing, the burden of proof shifts to the party opposing the lift stay motion.  Once a prima facie showing of cause is proffered by a creditor seeking relief from the automatic stay, the burden of proof as to whether the automatic stay shall be continued falls upon the debtor." *In re Uvaydov*, 354 B.R. 620, 623-24 (Bankr. E.D.N.Y. 2006) (citing 11 U.S.C. § 362(g)(2)) (internal citation omitted).

61.     The lack of adequate protection for CPC's interest in the Real Property establishes ample cause to lift the automatic stay. The lack of equity in the Real Property, the Debtor's inability to make any adequate payments or offer any other form of adequate protection, and the Debtor's proven inability to complete the Project within a reasonable time resoundingly show that CPC's interest is not adequately protected and, in fact, continues to diminish.

62.     There is abundant cause to lift the automatic stay to allow CPC to complete the Foreclosure Action and exercise its rights under the Loan Documents and non-bankruptcy law.

**c.   <u>Stay Relief is Warranted Under Section 362(d)(2).</u>**

63.     "[I]t is the burden of the *debtor* to establish that the collateral at issue is 'necessary to an effective reorganization'" under Bankruptcy Code § 362(d)(2)(B).  *United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., Ltd. (In re Timbers of Inwood Forest Assocs., Ltd.),* 484 U.S. 365, 375, 108 S.Ct. 626, 98 L.Ed.2d 740 (1988) (citing 11 U.S.C § 362(g)) (emphasis in original) ("*Timbers*").  The debtor's burden "is not merely a showing that if there is conceivably to be an effective reorganization, this property will be needed for it; but that the property is essential for an effective reorganization *that is in prospect.*" *Id.* at 375–76, 108 S.Ct. 626 (emphasis in original). For an effective reorganization to be in prospect, "there must be a reasonable possibility of a

successful reorganization within a reasonable time." *Id.* at 376, 108 S.Ct. 626 (internal quotation marks omitted).

64.    Section 362(d)(2) warrants lifting the automatic stay for the same reasons that the absence of a reasonable possibility of confirmation requires lifting the automatic stay under § 362(d)(3). *See* Part IV(a) above. There is no prospect that the Plan will succeed; indeed, it is certain to fail.

   d.    **Waiver of 14 Day Stay Under Bankruptcy Rule 4001(a)(3).**

65.    Bankruptcy Rule 4001(a)(3) provides that "[a]n order granting a motion for relief from automatic stay made in accordance with Rule 4001(a)(1) is stayed until the expiration of 14 days after the entry of the order, unless the court orders otherwise."  CPC submits that under the facts and circumstances of this case, waiver of the 14 day stay of Bankruptcy Rule 4001(a)(3) is warranted.  Accordingly, CPC requests that the Court waive the 14 day stay in Bankruptcy Rule 4001(a)(3) and enter any order terminating the automatic stay effective immediately.

## V.    NOTICE

66.    CPC will give notice of this Motion to the Debtor, counsel for the Debtor, the Office of the United States Trustee, creditors included on the list filed pursuant to Bankruptcy Rule 1007(d), creditors who filed proofs of claim, and parties who have filed notices of appearance an demands for notice, and respectfully submits that notice of the Motion in this manner satisfies the service requirements of Bankruptcy Rule 9014(b).

67.    No prior request for the relief sought herein has been made in this or any other Court.

# VI.    CONCLUSION

68.    For all of the foregoing reasons, CPC respectfully requests that the Court enter the proposed form of order attached hereto as **Exhibit 1** modifying or terminating the automatic stay pursuant to Bankruptcy Code § 362(d) to allow CPC to prosecute the Foreclosure Action and to exercise its rights under the Loan Documents and other applicable non-bankruptcy law, waiving the 14 day stay of the effectiveness of an order granting a motion for relief from the automatic stay made in accordance with Bankruptcy Rule 4001(a)(1), and granting such other relief as the Court deems appropriate.

Dated:  New York, New York                    Respectfully submitted,
        May 7, 2025

                                              WINDELS MARX LANE & MITTENDORF, LLP
                                              *Attorneys for CPC Funding SPE 1 LLC*


                                      By:     */s/ Mark A. Slama*_____
                                              Mark A. Slama (mslama@windelsmarx.com)
                                              Eloy A. Peral (eperal@windelsmarx.com)
                                              Daniel F. Corrigan (dcorrigan@windelsmarx.com)
                                              New York, New York 10019
                                              Tel. (212) 237-1000

**EXHIBIT 1**

**Proposed Order**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------------------x

In re:                                                                Chapter 11

      VALDESIA GARDENS HOUSING                    Case No.: 24-23086 (KYP)
      DEVELOPMENT FUND CORPORATION,

                               Debtor.
-------------------------------------------------------------------------x

## ORDER MODIFYING AUTOMATIC
## STAY PURSUANT TO 11 U.S.C. § 362(d)(1)-(3)

Upon the motion (the "***Motion***")[37] dated May 7, 2025 filed by CPC Funding SPE 1 LLC

("***CPC***"), by and through its attorneys, Windels Marx Lane & Mittendorf, LLP, seeking the entry

of an order pursuant to § 362(d)(1)-(3) of title 11 of the United States Code, 11 U.S.C. §§ 101 et.

seq. (the "***Bankruptcy Code***") for relief from the automatic stay to permit CPC to exercise its

rights under the Loan Documents and other applicable law with respect to the Debtor and the Real

Property, including completion of the Foreclosure Action, and granting related relief; and CPC

having caused service of the Motion and/or the notice of the hearing on the Motion scheduled

for [_____] [___], 2025 ("***Hearing***"), to be filed with the Court and adequately served;

and the Court having held the Hearing to consider the Motion, at which time all interested parties

were offered an opportunity to be heard with respect to the Motion; and the Court having reviewed

and considered (i) the Motion and the exhibits thereto, and (ii) the arguments of counsel made,

and the evidence proffered or adduced at the Hearing; and any objections having been filed to the

Motion being withdrawn, overruled, or otherwise resolved; and it appearing that the relief

requested in the Motion is in the best interests of the Debtor, its estate, creditors, and all parties

---

[37] Unless otherwise stated, capitalized terms herein that are undefined shall have the same meaning as ascribed to them in the Motion.

in interest in the chapter 11 case; and upon the record of the Hearing and the chapter 11 case; and after due deliberation thereon and good cause appearing therefor,

**IT IS ORDERED THAT**:

1.      The Motion is granted to the extent set forth below.

2.      The automatic stay imposed by Bankruptcy Code § 362(a) in the chapter 11 case is modified and vacated to the extent applicable to permit CPC to proceed with the Foreclosure Action through to completion, including to effectuate the foreclosure sale of the Real Property and to exercise all its rights under the Loan Documents and non-bankruptcy law.

3.      The requirement of Bankruptcy Rule 4001(a)(3) that an order granting a motion for relief from the automatic stay made in accordance with Bankruptcy Rule 4001(a)(1) is stayed until the expiration of 14 days after entry of the order is waived and this Order shall be effective and enforceable immediately upon entry.

4.      This Court may retain jurisdiction with respect to any matters, claims, rights, or disputes arising from or relating to the implementation of this or any other Order of this Court entered in the chapter 11 case.